**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AFL PHILADELPHIA LLC, and, | : | CIVIL ACTION |
| JON BONGIOVI, JR., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | NO. 09-614 |
| JOSEPH E. KRAUSE, JR. | : | |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM RE: MOTION TO DISMISS**</u>

Baylson, J.                                                                June 4, 2009

        In sports, as in legal battles, there are winners and there are losers, and the case before

this Court tells the tale of both.  In the instant matter, the local arena football team the

Philadelphia Soul—partially owned by rock icon Jon Bongiovi (also known as Bon Jovi)—rose

in a "Blaze of Glory"[1] to win the 2008 national championship Arena Bowl and then was "Shot

Through the Heart" when its 2009 season was cancelled by the League due to financial problems.

The team and League remain "Living on a Prayer" that they will return in the 2010 season and

beyond.  In the meantime, the Philadelphia Soul and a former employee are trading accusations

concerning the fall-out of the season's cancellation, in which they each experienced a taste of

"Bad Medicine."

        To "kick off" this legal battle, Plaintiffs AFL Philadelphia LLC and Bongiovi brought

copyright infringement, trademark infringement, and other assorted actions against Defendant

Joseph Krause, Jr.  Responding with a "turnover," Defendant brought Counterclaims under the

───────────────

        [1]The Undersigned wishes to credit his law clerk for her helpful knowledge of popular
music in drafting this Memorandum.

Lanham Act and for misappropriation of name.  In the "first quarter" of what will undoubtedly be

a hard fought battle, this Court will declare Defendant the winner and DENY Plaintiffs' Motion

to Dismiss Defendant's Counterclaims.

**I.     Background**

    **A.     Facts**

        1.     Complaint

AFL Philadelphia LLC owns and operates the Philadelphia Soul, an arena football team

based in Philadelphia and playing in the Arena Football League since 2004.  (Compl. ¶¶ 8, 10.)

In 2008, the Philadelphia Soul won the arena football national championships.  (Compl. ¶ 10.)

Bongiovi is co-owner of the Philadelphia Soul and holds multiple copyrights and trademarks for

Philadelphia Soul merchandise.  (Compl. ¶¶ 12-21.)  At issue as the original basis for this lawsuit

is a copyright allegedly held by Bongiovi for a 2008 Championship Ring designed to

commemorate the Philadelphia Soul's national championship victory and to be distributed to the

team's players, coaches, and executives.  (Compl. ¶ 11.)

        2.     Counterclaim

Defendant Krause is the former Director of Sales for the Philadelphia Soul, which

included responsibility for game and season ticket sales.  (Countercl. ¶ 6.)  Defendant alleges as

follows: he was hired for the position because of his well-known and favorable reputation in the

sports and entertainment business as an energetic personality and public relations specialist who

brought ongoing personal and business relationships to his position (Countercl. ¶ 7); he utilized

his solid reputation and ongoing relationships to promote the team in general and to sell game

and season tickets, therefore enhancing his solid reputation in the industry amongst fans and

season ticket holders (Countercl. ¶¶ 8-9); and the team's record-breaking ticket sales were due directly to his efforts (Countercl. ¶ 11).

In mid-December 2008, the Arena Football League suspended its 2009 season. (Countercl. ¶ 11.)  Defendant and other employees were given a one-week notice of termination. (Countercl. ¶ 12.)  Defendant claims that the decision to cancel the 2009 season was hugely unpopular among the team's fans, especially 2009 season ticket holders.  (Countercl. ¶ 13.)  The season ticket holders publicly criticized the team's failure to immediately issue season ticket refunds, and there were media reports of complaints filed with the Pennsylvania Attorney General's Office.  (Countercl. ¶ 14-15.)  At about this time, the Philadelphia Soul owners and/or management set up an e-mail notification system to its fans about the cancellation of the season. (Countercl. ¶ 16.)

Defendant further alleges the following: after his termination, the Philadelphia Soul sent an email to its fans about the season's cancellation that falsely designated the origin of the email as having been sent from Defendant's Philadelphia Soul email address[2] (Countercl. ¶ 17, Ex. A); Defendant did not send the email, had no role in notifying fans of the season's cancellation, and never authorized the Philadelphia Soul to use his name or email address for such a notification (Countercl. ¶ 18); by this false designation, the Philadelphia Soul sought to cause confusion amongst fans as to Defendant's association with the unpopular decision to cancel the 2009 season and the resulting controversy over season ticket refunds (Countercl. ¶ 19); and the Soul

---

[2]Defendant states that Exhibit A to Defendant's Counterclaim is an example of one such email.  Exhibit A is a January 16, 2009 email about the Arena Football League suspension of play and the closing of the Philadelphia Soul office.  The "From" line of the email states: "Joe Krause [mailto: jkrause@philadelphiasoul.com]."

traded on his good name and reputation amongst the fan base (Countercl. ¶ 20).

### B.      Procedural History

Plaintiffs filed their Complaint for copyright infringement, trademark infringement, false advertising and designation of origin, unjust enrichment, and violations of the Anti-cybersquatting Consumer Protection Act on February 12, 2009 (Doc. No. 1).[3]  Defendant answered and asserted counterclaims under the Lanham Act and for misappropriation of name on March 6, 2009 (Doc. No. 6).  Plaintiffs filed their Motion to Dismiss Defendant's Counterclaims on March 25, 2009 (Doc. No. 9).  Defendant responded on April 16, 2009 (Doc. No. 15), and Plaintiff replied on April 24, 2009 (Doc. No. 16).

## II.    <u>Jurisdiction</u>

Jurisdiction is proper on the basis of 28 U.S.C.A. § 1331, § 1338, and § 1367.  Plaintiffs' and Defendant's claims arise under the copyright laws, 17 U.S.C. §§ 101 et. seq; the Lanham Act, 15 U.S.C. § 1051 et seq; the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); and the common law.  This court has supplemental jurisdiction over Plaintiffs' and Defendant's common law claims.

## III.   <u>Parties' Contentions</u>

### A.      Plaintiffs

Plaintiffs argue that both of Defendant's counterclaims must be dismissed as a matter of

---

[3]This Court also briefly considered a related lawsuit between these same parties, <u>Krause v. Philadelphia Soul</u>, 09-cv-1132. Krause originally filed the case in state court on January 2, 2009, in which he alleged breach of contract and other claims arising out of his employment dispute with Defendants. Defendants removed the case to this Court on March 14, 2009. However, this Court remanded the case based on lack of subject matter jurisdiction. 2009 WL 1175625 (E.D. Pa. April 30, 2009).

law for the following reasons.  As to Defendant's Lanham Act claim for false designation of origin of the Philadelphia Soul email, Plaintiffs claim that it must fail for three reasons.  First, Plaintiffs argue that Defendant does not have prudential standing under the Lanham Act because he has not alleged competitive harm, which they argue is the only type of harm protected by the Lanham Act.  Second, Plaintiffs claim that Defendant's name is not a legally protected mark under the Lanham Act because Defendant has not alleged that his name has acquired the requisite secondary meaning.  Third, Plaintiffs assert that Defendant has not alleged that false designation of origin of the email caused the requisite likelihood of confusion of the team's goods or services, as required by caselaw.

As to Defendant's invasion of privacy claim, specifically misappropriation of name, Plaintiffs argue that Defendant has failed to allege that his name was appropriated for commercial advantage, as required to sustain a valid claim.  Further, Plaintiffs assert that Pennsylvania requires a showing that the appropriated name has acquired secondary meaning, and as it argued for the Lanham Act claim, Defendant has failed to allege this.

### B.    Defendant

Defendant argues that he has sufficiently pled the required elements of his counterclaims. As to his Lanham Act claim, Defendant argues that he has alleged facts to establish prudential standing, specifically that he has a commercial interest in his name which was harmed by Plaintiffs' falsely designated email.  Second, Defendant claims that he has pled facts to show that his name has the necessary secondary meaning in the sports and entertainment industry to be a valid and legally protected mark under the Lanham Act.  Third, Defendant argues that he specifically alleged that the emails were intended to and did cause customer confusion.

As to his misappropriation of name claim, Defendant argues that he pled that the misappropriation of his name was done for commercial advantage.  He further claims that secondary meaning is not required for a misappropriation of name claim, but that he sufficiently pled such secondary meaning regardless.

## IV.   <u>Legal Standard</u>

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments.  <u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1251, 1261 (3d Cir. 1994).  The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  <u>Angelastro v. Prudential-Bache Sec., Inc.</u>, 764 F.2d 939, 944 (3d Cir. 1985).

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009).  <u>Iqbal</u> clarified that the Court's decision in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), which required a heightened degree of fact pleading in an anti-trust case, "expounded the standard for 'all civil actions.'" 129 S.Ct. at 1953.

The Court in <u>Iqbal</u> explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted.  <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555); <u>see also</u> <u>Phillips v. County of</u>

Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation

in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair

notice,' but also the 'grounds' on which the claim rests." (citing Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 556 n.3 (2007))).  Accordingly, to survive a motion to dismiss, a plaintiff must

plead "factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  Iqbal, 129 S.Ct. at 1949.

## V.  **Discussion**

### A.    **Lanham Act Claim**

Defendant has brought a false designation of origin claim under the Lanham Act, which

specifically states:

> (1)    Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false designation of origin, false
> or misleading description of fact, or false or misleading representation of
> fact, which–
>
> > (A)    is likely to cause confusion, or to cause mistake, or to deceive as to
> > the affiliation, connection, or association of such person with
> > another person, or as to the origin, sponsorship, or approval of his
> > or her goods, services, or commercial activities by another person,
> > or
> >
> > (B)    in commercial advertising or promotion, misrepresents the nature,
> > characteristics, qualities, or geographic origin of his or her or
> > another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  This section of the statute, often referred to as Section 43(a) from the

original Act, encompasses both false designation of origin claims under § 43(a)(1)(A)—also

referred to as false association or unfair competition claims—like the one at issue here and false

advertising claims under § 43(a)(1)(B).  See Joint Stock Soc'y v. UDV North Am., Inc., 266 F.3d 164, 171 (3d Cir. 2001).  Certain legal standards apply to both types of § 43(a) claims, but others diverge depending on the type of claim.  Overall, "[t]he Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'"  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-768 (1992) (quoting 11 U.S.C. § 1127).  Although other sections of the Act deal with registered trademarks, Section 43(a) protects qualifying unregistered trademarks, and the general principles to qualify a registered mark are largely applicable in determining whether an unregistered mark qualifies for protection under Section 43(a).  Id. at 768.

In order to state a claim under Section 43(a) of the Lanham Act,  a plaintiff must show: (a) the mark is valid and legally protectable, (b) it owns the mark, and (c) the defendant's use of the mark to identify goods or services causes a likelihood of confusion.  Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005) (quoting A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d Cir. 2000)).

### 1.   Prudential Standing

Before addressing the substantive elements of Defendant's false designation of origin claim, this Court must first consider whether Defendant has prudential standing to bring a Lanham Act claim.  Prudential standing is distinct from constitutional standing in that constitutional standing relates to whether an Article III "case" or "controversy" exists, which Plaintiffs are not contesting here.  Prudential standing, on the other hand, relates to judge-made prudential limits on the exercise of federal court jurisdiction, "forming an integral part of judicial self-government."  Gen. Instrument Corp. of Del. v. Nu-Tek Elec., 197 F.3d 83, 87 (3d Cir.

1999) (internal quotations omitted). "These requirements are designed to 'limit access to the federal courts to those litigants best suited to assert a particular claim.'" Id. (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985)). Therefore, a claimant's grievance must fall within the "zone of interests" protected or regulated by the statute at issue. Nevyas v. Morgan, 309 F.Supp.2d 673, 678 (E.D. Pa. 2004). Congress may expressly negate prudential standing principles by statute, but the Third Circuit has held that Congress did not do so in passing the Lanham Act. Id. (citing Joint Stock Soc'y, 266 F.3d at 179; Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 227 (3d Cir. 1998)).

 In Thorn v. Reliance Van Co., the Third Circuit first articulated prudential standing under the Lanham Act as "whether the party has a reasonable interest to be protected against false advertising." 736 F.2d 929 (3d Cir. 1984). Subsequently in Conte Brothers, the Third Circuit adopted the Supreme Court's test for antitrust standing in order to determine standing under the Lanham Act. 165 F.3d at 233. The five factor test is as follows: (1) the nature of the plaintiff's alleged injury; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the plaintiff to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages. Id. Additionally, although Conte Brothers involved a false advertising claim under the Lanham Act, as Plaintiffs note in their Reply brief, the Conte Brothers court rejected a test for prudential standing that distinguished between false association claims under § 43(a)(1)(A) and false advertising claims under § 43(a)(1)(B) of the Act. Id. at 232-33. See also Joint Stock Soc'y, 266 F.3d at 180-86 (applying the Conte Brothers five factor test to both a false designation of origin and a false advertising claim); Cook Drilling Corp. v. Halco Am., Inc., 2002 WL 84532, at *6-9 (E.D. Pa. Jan. 22, 2002)

(applying the Conte Brothers five factor test to a false designation of origin claim).  The Third

Circuit and district courts in this Circuit have continued to follow the five-factor test since Conte

Brothers, with no one factor given determinative weight.[4]  See Knit With v. Knitting Fever, Inc.,

2008 WL 5381349, at *10 (E.D. Pa. Dec. 18, 2008) (collecting cases).

a.     Nature of the Injury

In the instant Motion, Plaintiffs claim that Defendant has failed to meet the first-prong of

the Conte Brothers test, the nature of the injury.  Under this factor, the Court must consider

whether Defendant's alleged injury is of the type that Congress sought to redress when providing

a private remedy under the Lanham Act.  Knit With, 2008 WL 5381349 at *10.  "The Lanham

Act is primarily intended to protect commercial interests and provides a private remedy to a

commercial plaintiff who meets the burden of proving that its commercial interests have been

harmed by a competitor's false advertising."  Nevyas, 309 F.Supp.2d at 678 (citing Sandoz

Pharmaceuticals v. Richardson-Vicks, Inc., 902 F.2d 222, 230 (3d Cir. 1990)).  Plaintiffs claim

that Defendant has not alleged the necessary competitive harm to have standing to bring a

Lanham Act claim.

Contrary to Plaintiffs' argument, the Lanham Act does not require that the parties be

competitors.  In Thorn, the Third Circuit specifically held that the fact that a claimant is not a

competitor to the adverse party does not preclude prudential standing to bring a Lanham Act

---

[4] Plaintiffs argue in their Reply brief that the Conte Brothers five factor test is inapplicable since Defendant fails to allege competitive harm, which the Lanham Act requires. Plaintiffs cite to Sandoz Pharmaceuticals v. Richardson-Vicks, Inc., 902 F.2d 222 (3d Cir. 1990) for this proposition.  However Sandoz preceded Conte Brothers, and the Conte Brothers test is the definitive standard in this Circuit for determining prudential standing under the Lanham Act as noted above.  Sandoz remains applicable in that it describes the intent of the Lanham Act, which is addressed by the first prong of the Conte Brothers test.

claim. 736 F.2d at 933. In that case, the plaintiff, the president, CEO, director, and forty-five-percent shareholder in a trucking company, brought a Lanham Act claim against a competing company and its officers and directors for false advertising that allegedly drove plaintiff's company into bankruptcy. Id. at 930-31. Although the Third Circuit found that the plaintiff as an individual investor in the harmed company was not a direct competitor of the competing company, it held that the plaintiff had a sufficiently direct injury to fall within the class of persons to be protected by the Lanham Act. Id. at 933. However the Third Circuit in Serbin v. Ziebart Int'l Corp., Inc., 11 F.3d 1163, 1179 (3d Cir. 1993) failed to extend Lanham Act standing to consumers.

Subsequently in Conte Brothers, the Third Circuit reiterated that a non-competitor may have prudential standing under the Lanham Act in certain circumstances. 165 F.3d at 234. However, in that case, the Court found that the plaintiffs, a nationwide class of retailers who sold a product that competed with the defendant manufacturer's product, did not have prudential standing to assert a Lanham Act claim. The Court emphasized that "the focus of the Lanham Act is on commercial interests that have been harmed by a competitor's false advertising and in secur[ing] to the business community the advantages of reputation and goodwill by preventing their diversion from those who have created them to those who have not." Id. (internal quotations and emphasis omitted). Based on this, the Court found that the plaintiffs, as retailers, had alleged a commercial interest but had not alleged an impact on their ability to compete with the defendant, a manufacturer, necessary to allege the required competitive harm. Id. Nor had the plaintiffs indicated that their goodwill or reputation had been directly or indirectly harmed. Id. In interpreting Conte Brothers, Judge Buckwalter recently stated, "[t]hus, a plaintiff must

-11-

allege both a commercial interest and either a competitive harm or injury to good will or reputation."  <u>Knit With</u>, 2008 WL 5381349 at *12.

In the instant case, Defendant has pled a commercial interest in his name, since he asserts that he has a solid reputation and media personality in the sports and entertainment industry (Countercl. ¶ 7), and Plaintiffs do not dispute that Defendant has a commercial interest. However, Defendant is not a direct competitor with Plaintiffs, since Defendant merely works in sales and public relations in the sports and entertainment field, whereas Plaintiffs own and operate a currently-suspended arena football team.[5]  Instead, Defendant argues in his brief and pled in his counterclaim that the nature of his injury was his loss of reputation and goodwill amongst the public and Philadelphia Soul fans.  (Countercl. ¶ 25.)  Further Defendant pled that Plaintiff's false designation of Defendant as the source of the email was done "to trade upon his good name and reputation among the fan base and season ticket holders."  (Countercl. ¶¶ 7, 20.)

However, pleading loss of reputation and goodwill by itself is not enough.  Instead, a claimant must allege specific injury to goodwill or reputation *from which another competitor gained.*  <u>Knit With</u>, 2008 WL 5381349 at *12.  As explained in <u>Cook Drilling</u>, "the operative congressional concern [in enacting the Lanham Act] was not with remedying reputational harms

---

[5]Defendant states in his brief but does not allege in his Counterclaim that because he is in the sports marketing field, he "competes directly with the Philadelphia Soul." (Def.'s Memo. Law Opp'n Pls.' Mot. Dismiss 7.)  However the Court does not agree that merely because Defendant works in the same field, he is a direct competitor with an entire team franchise.  <u>See</u> <u>Thorn</u>, 736 F.2d at 933 (finding that an individual investor in a company in the same field as a competing company was not a competitor); <u>see also</u> <u>Nevyas</u>, 309 F.Supp.2d at 680 (finding that nothing in the complaint suggested that defendants sought to divert the plaintiffs' business to themselves or personally reap any financial benefit from their actions).  In his counterclaim, Defendant describes his injury not in terms of direct economic competition but as injury to his reputation and loss of goodwill.

per se, but rather with addressing the deliberate transference by means of misrepresentation of the good will and reputation earned by a party." 2002 WL 84532 at *7. In <u>Cook Drilling</u>, Judge Yohn found that the plaintiff's allegation, "distilled to its essence," was that its reputation would suffer as a consequence of defendant's deception, but not that its reputation would suffer and defendants' reputation would be bolstered. <u>Id.</u> Finding that this factor weighed heavily against prudential standing, Judge Yohn went on to find that the plaintiff lacked prudential standing. <u>Id.</u> at 10.

Applying the same five-factor prudential standing test as the Third Circuit, a district court in Texas also examined a Lanham Act claim where the plaintiff alleged reputational damage and lost sales, as a result of the defendant posting false, deceptive, disparaging, and misleading messages about the plaintiff on its consumer complaint forum website. <u>MCW, Inc. v. Badbusinessbureau.com, LLC</u>, 2004 WL 833595, at *13 (N.D. Tex. Apr. 19, 2004). The court found that without allegations both that plaintiff was and will be harmed by the false messages *and* that defendant's reputation will be bolstered, this factor weighed heavily against finding prudential standing. <u>Id.</u>

It is a close call whether or not Defendant's claim suffers from the same missing element as the plaintiffs in <u>Cook Drilling</u> and <u>MCW, Inc.</u>. Although Defendant has pled damage to his goodwill and reputation, he has not directly alleged that Plaintiffs gained any goodwill by sending the falsely-designated email. To the contrary, Defendant's pleadings state that Plaintiffs suffered a similar loss of goodwill and reputation from the decision to cancel the 2009 Philadelphia Soul season and the resulting controversy around season ticket refunds. (Countercl. ¶¶ 13-15.) However Defendant's counterclaim, when liberally construed, implies that the

Philadelphia Soul falsely designated the origin of the email either to soften the blow of an

unfavorable message and / or apportion some of the blame to someone else by "trading upon

[Defendant's] good name and reputation amongst the fan base and season ticket holders at a time

when fan criticism and public backlash over management's decision making was at an all time

high." (Countercl. ¶ 20.)  The allegations therefore suggest that the Philadelphia Soul diverted

some of their reputational damage to Defendant by associating him with their actions.  Therefore

the first factor in the prudential standing test favors Defendant's ability to bring his Lanham Act

claim.

                                                                     b.      __Directness of Injury__

      The second factor of the __Conte Brothers__ test examines the directness or indirectness of

the claimant's injury.  "The issue under this factor is whether the defendants' conduct has had a

direct effect on either the plaintiffs or the market in which they participate."  __Joint Stock Soc'y__,

266 F.3d at 181 (citations omitted).

      In this case, Defendant has pled that as a direct and proximate result of Plaintiffs' false

designation of the email as having originated with Defendant, he suffered a loss of reputation and

goodwill amongst the public and the team's fans (Countercl. ¶ 25), which resulted in lost

earnings, reputational harm, and emotional harm (Countercl. ¶ 26).  Therefore, the causal chain

would appear to be as follows: Philadelphia Soul fans received the email allegedly from Krause,

the fans associated Krause with the unpopular email, Krause lost reputation and goodwill by

being associated with the unpopular email, and Krause suffered difficulty in finding his next job

and / or accepted a job with lower pay than what he would have received absent this loss of

reputation and goodwill.  __See__ __Cook Drilling__, 2002 WL 84532 at *7-8 (analyzing the causal chain

between the false representation and the defendant's pecuniary harm and loss to reputation and goodwill).  At the Motion to Dismiss stage, this pleading is sufficient, although Defendant's alleged injury to reputation is more direct than his alleged injury of lost earnings.  After discovery, Defendant will have to offer specific evidence of the lost earnings and harm that he suffered as a result of Plaintiffs' actions.  This factor weighs weakly in favor of Defendant's prudential standing.

c.     Proximity of Plaintiff to Injury

The third factor for prudential standing is the proximity of the plaintiff to the allegedly harmful conduct.  Under this factor, the Court must examine "whether there is 'an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest' by bringing an enforcement action.'" Joint Stock Soc'y, 266 F.3d at 182 (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 542 (1983)).  Where such a class exists, this "diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." Id.  In Conte Brothers, the Third Circuit applied this factor by finding that manufacturers of competing products or consumers whose purchases were influenced by the false advertising were more directly harmed than the retailer class who had brought the suit, therefore arguing against prudential standing.  165 F.3d at 234.

In the instant case, Defendant is the most clearly identifiable party to bring this enforcement action.  His false designation of origin claim stems from Plaintiffs' falsely-designated email sent from Defendant's former account.  Therefore Defendant is not only the most proximate, but the only, party to be able to bring such an enforcement action related to this

email.  This factor weighs heavily in favor of finding prudential standing.

        d.     Speculative Nature of Damages

Under the speculative nature of damages factor, the Court must examine the damages "that are particular to the plaintiff." Joint Stock Soc'y, 266 F.3d at 184.  The factor considers both the speculative nature and the avoidability of claimed damages.  Knit With, 2008 WL 5381349, at \*16.

Since the nature of Defendant's harm is to his goodwill and reputation, his damages are speculative.  Defendant must value the amount that his professional image suffered from his association with the Philadelphia Soul's unpopular decision.  In addition, Defendant must value his lost earnings due to this reputational damage.  However, the damages were unavoidable, since Defendant likely could not foresee or mitigate the harm to his professional reputation.  Overall, this factor is neutral as to prudential standing.

        e.     Risk of Duplicative Damages

The final Conte Brothers factor relates to the risk of duplicative damages or the complexity of apportioning damages.  Joint Stock Soc'y, 266 F.3d at 168.  Since Defendant is the only person harmed by the falsely designated email from his account, there is no risk of duplicative damages.  This factor weighs in favor of prudential standing.

        f.     Prudential Standing Summary

Overall, four of the five Conte Brothers factors weigh in favor of prudential standing, and one is neutral.  Although the nature of Plaintiff's injury is somewhat remote from the type of injury that Congress sought to protect in the Lanham Act, harm to one's commercial reputation and goodwill are protected by the Lanham Act.  Moreover, reading the pleadings liberally, as this

Court is required to do at the Motion to Dismiss stage, the Court finds that Defendant has alleged

sufficient facts to have prudential standing to bring a Lanham Act claim.

2.      Defendant's Name as a Valid and Legally Protectable Mark

Once standing is established, the first element of a Lanham Act claim requires that the

contested mark be valid and legally protectable.   Tillery v. Leonard & Sciolla, LLP, 437

F.Supp.2d 312, 320 (E.D. Pa. 2006).  The Lanham Act states that an otherwise unregisterable

descriptive mark may be registered if it "has become distinctive of the applicant's goods in

commerce." Two Pesos, 505 U.S. at 769 (quoting 15 U.S.C. §§ 1052(e), (f)).  An identifying

mark is distinctive if: (1) it is inherently distinctive, or (2) it has acquired distinctiveness through

secondary meaning.  Id.  "The concept of secondary meaning has been applied to actions under §

43(a)." Id.

At issue in the instant case is the false designation of Defendant's name through the use

of his email address.  "Personal names can serve as a trademark, but they are considered

'descriptive,' not inherently distinctive marks, so they are treated as protectable marks only upon

showing of distinctiveness and secondary meaning." Tillery, 437 F.Supp.2d at 321; accord E. &

J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992); Scott Paper Co. v.

Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978), abrogated on other grounds by

Pullman-Standard v. Swint, 456 U.S. 273, 287 (1982).  A personal name acquires secondary

meaning when the name and the business it is associated with "become synonymous in the public

mind and the secondary meaning submerges the primary meaning of the name as a word

identifying a person, in favor of its meaning as a word identifying that business." Tillery, 437

F.Supp.2d at 321 (internal quotations omitted).  Therefore the claimant must not only show that it

-17-

used the personal name as a trademark, "but that a substantial portion of the consuming public associates [the name] specifically with [its] business." Id. (quoting Flynn v. AK Peters, Ltd., 377 F.3d 13, 20 (1st Cir. 2004)).  "Secondary meaning must exist 'at the time and place that defendant began use of the mark.'" Lewis v. Marriott Int'l., Inc., 527 F.Supp.2d 422, 426 (E.D. Pa. 2007) (quoting Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000)).

There is not yet a consensus in the caselaw as to the specific elements to determine whether a mark has acquired the requisite secondary meaning.  Commerce, 214 F.3d at 438. However the Third Circuit has enumerated the following factors to guide an inquiry of whether secondary meaning exists: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.  Id.  These factors are a non-exclusive list, and therefore the absence of any particular factor does not require dismissal. Lewis, 527 F.Supp.2d at 426.

Defendant cites to Lewis as a case with analogous facts, because it involved a Lanham Act claim based on false advertising of plaintiff's name.  527 F.Supp.2d at 427-28.  In that case, the plaintiff had been the executive chef at the Philadelphia Downtown Courtyard by Marriott until he left to start a private catering business.  Id. at 423.  The plaintiff alleged that the hotel continued to use his name in marketing materials to sell its wedding packages.  Id.  Plaintiff's complaint alleged his excellent reputation in the food and event planning industry in the Philadelphia area, his success within the Marriott organization, the success of Marriott's wedding

-18-

packages based on his efforts, his resulting name recognition in the industry, his six years as Marriott's executive chef, the doubling of revenues from his wedding packages over that period, and the resulting misleading of customers when Marriott continued to use his name after his resignation.  Id. at 426-27.  Based on these allegations, Judge Robreno stated that the following factors favored a finding of secondary meaning: length of use of the plaintiff's name, extent of sales and advertising leading to buyer association, a resulting large number of sales, the fact of defendant's copying, and actual confusion of customers as a result.  Id. at 427.

In the instant case, Defendant has pled the following allegations related to secondary meaning: his well known and very favorable reputation in the sports and entertainment business as a media personality and public relations specialist for which Defendant was hired (Countercl. ¶ 7), utilization of Defendant's reputation and relationships to promote the team and sell tickets (Countercl. ¶ 8), record breaking ticket sales due directly to his efforts (Countercl. ¶ 11), the distribution of an email falsely designated as having been sent from Defendant's Philadelphia Soul email address (Countercl. ¶ 17), Plaintiffs' intent to cause confusion amongst fans as to Defendant's connection with the unpopular email by their false designation (Countercl. ¶ 19), and actual deceit or at least a tendency to deceive the public who received the falsely-designated email (Countercl. ¶ 23).  Based on these allegations, the Court finds the following factors tend to show secondary meaning: length of use of Defendant's favorable reputation in the industry during his tenure as Director of Sales, the extent of sales leading to buyer association based on Defendant's reputation and relationships, large numbers of sales based on record breaking ticket sales, the fact of copying Defendant's name by sending the falsely designated email, and actual confusion by the recipients of the email.  Although this list represents only five of the eleven

factors, Judge Robreno in <u>Lewis</u> denied defendant's motion to dismiss based on the same factors present here.

Plaintiffs argue that Defendant has not alleged any factors that would tend to show secondary meaning.  (Pls.' Memo. Law Supporting Mot. Dismiss 6 n.2.)  They state that there is no indication that the Philadelphia Soul used Defendant's name in connection with the team or that Defendant alleged that his name was advertised in connection with the Philadelphia Soul. (<u>Id.</u> at 7.)  Further they argue that Defendant's name and the Soul were not advertised as synonymous.  (<u>Id.</u>)  Plaintiffs state that Defendant's allegations regarding his reputation establish not that his name took on secondary meaning as being associated with the Soul but that he had an established reputation before joining the team and that during his time with the Soul he was merely an employee.  (<u>Id.</u>)  In their Reply brief, Plaintiffs advance the additional argument that it is not enough that Defendant allege that his name is synonymous with an entire industry but that it must be synonymous with a particular business.  (Pls.' Reply Def.'s Memo. Law Opp'n Mot. Dismiss 4.)  Plaintiffs claim that Defendant has alleged his association with the sports and entertainment field generally but not his association with the Philadelphia Soul specifically.

To support these arguments, Plaintiffs cite to <u>Tillery</u>.  In that case, the plaintiff sued his former law firm, whose website's domain name continued to use Plaintiff's last name after he was no longer a partner at the firm.  In considering whether the plaintiff's name had acquired secondary meaning, Judge Shapiro found that "it does not appear from the record that [plaintiff's name] was ever used in connection with a business or a product except as part of the name of law firms with which he was associated since his third year of practice . . . ."  <u>Tillery</u>, 437 F.Supp.2d at 321.  Judge Shapiro also noted that there was no evidence that the plaintiff had commanded a

-20-

particularly large share of the market, that plaintiff had made substantial effort to market his own

services separately from his firm, that others had tried to copy plaintiff's trademark, and that

plaintiff had presented no customer surveys or testimony.  Id.  Instead, plaintiff had generated

few new client matters towards the end of his practice and these were all by referral.  Id.

However, that particular decision considered the plaintiff's motion for preliminary injunction,

and therefore analyzed secondary meaning of plaintiff's name in the context of whether plaintiff

had a likelihood of success on the merits of his Lanham Act claim.

One year later, Judge Shapiro revisited Tillery in the context of the defendant's motion

for summary judgment and found that there was sufficient circumstantial evidence to present a

genuine issue of material fact with respect to secondary meaning.  Tillery v. Leonard & Sciolla,

LLP, 521 F.Supp.2d 346, 349 (E.D. Pa. 2007).  Judge Shapiro based this finding on plaintiff's

allegations of long-time use of his name in practicing intellectual property law; his production of

press releases, articles, and speeches to support this claim; and the defendant's admissions in past

marketing materials.  Id.  Because the standards for ruling on a motion for preliminary injunction

and a motion to dismiss are very different, Judge Shapiro allowed the plaintiff's Lanham Act

claim to go forward on these factual issues.  Because this Court is deciding a Motion to Dismiss,

it is much more persuaded by the summary judgment analysis in Tillery than the preliminary

injunction analysis.

In this case, although it is true that Defendant has not alleged that his name was

specifically used in advertisements to promote the Philadelphia Soul, as Lewis's name was used

to promote the Marriott wedding packages, Defendant is not bringing a false advertising claim as

Lewis did.  Instead, Defendant brings a false designation claim, so he does not have to make

allegations regarding advertising.  Yet the same test for secondary meaning applies to both false advertising and false designation claims.  See Flynn v. Health Advocate, Inc., 169 Fed. Appx. 99, 101 (3d Cir. 2006) (applying the eleven-factor secondary meaning test to a false designation of origin claim).  Here Defendant has pled several of the factors to establish secondary meaning as described above.

Furthermore, it is not necessary that Defendant establish secondary meaning between his name and the Philadelphia Soul specifically.  Judge Robreno in Lewis found that based on the plaintiff's allegations, "it is reasonable to infer that his personal marketing was successful with the public and thus created an association between the name 'Carl Lewis' and event planning and catering."  527 F.Supp.2d at 427.  Judge Shapiro in Tillery stated that the plaintiff had alleged "long-time use of the mark TILLERY in the practice of intellectual property law."  521 F.Supp.2d at 349.  Therefore in both cases it was sufficient that the plaintiffs' names were associated with their particular industries and not with a specific employer or company.  Defendant's allegations are analogous in associating his own name with the sports marketing industry.

Taking Defendant's allegations as true and construing his counterclaim in the light most favorable to him, Defendant has pled sufficient allegations to support a finding of secondary meaning in his name.  Therefore, Defendant has established the first element of a valid Lanham Act claim.

3.    Likelihood of Confusion

Plaintiffs do not contest the second element of valid Lanham Act claim, that Defendant owns the contested mark.  However Plaintiffs argue that Defendant has not shown the third

element: likelihood of confusion on the part of consumers as to the source of the good or service. In order to show likelihood of confusion, the claimant must show that "consumers viewing the [ ] mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Commerce Nat. Ins. Services, Inc., 214 F.3d at 438-439 (internal quotations omitted).  The Third Circuit generally evaluates likelihood of confusion based on weighing the ten Lapp factors: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.  Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). In examining these factors, the court need not give each equal weight, and the inquiry is done on a fact-specific basis.  Tillery, 437 F.Supp.2d at 324.

Plaintiffs argue that Defendant has not pled likelihood of confusion related to the origin of the Philadelphia Soul's "goods or services."  (Pl.'s Memo. 8.)  They claim that recipients of the allegedly infringing email could not be confused as to its origin because it reflected and indeed did originate from the Philadelphia Soul.  Presumably, Plaintiffs are arguing that because

the email was sent from Defendant's email address "@philadelphiasoul.com," this establishes that the email originated from the Philadelphia Soul.

The Court does not agree with Plaintiffs' argument.  The allegedly infringing email contains the line "From: Joe Krause [mailto:jkrause@philadelphiasoul.com]."  Therefore the email clearly indicated that it originated from Defendant, albeit in his role as a Philadelphia Soul employee.  Further, Defendant has pled that the Philadelphia Soul, by sending the email, "sought to cause confusion amongst fans" as to Defendant's association with the season's cancellation (Countercl. ¶ 19), and that email "actually deceived, or at least there was a tendency to deceive, members of the public" (Countercl. ¶ 23).  Therefore Defendant has directly pled a likelihood of confusion.  Applying the <u>Lapp</u> factors, Defendant has pled a high degree of similarity between his name and the alleged infringing email designation of origin, strength in his mark based on the elements of the secondary meaning analysis described above, the Philadelphia Soul's intent to trade upon Defendant's good name in falsely designating the email, actual confusion, and that Defendant and the Philadelphia Soul operate in the same general industry.  Based on these allegations, Defendant has pled likelihood of confusion sufficient to establish the third element of his Lanham Act claim.

### B.   Misappropriation of Name Claim

Defendant's second counterclaim is for invasion of privacy, specifically misappropriation of name.  This tort is described in the Restatement as follows: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."  Restatement (Second) of Torts § 625C (1977).  "The Pennsylvania Supreme Court has expressly recognized a cause of action for 'invasion of privacy' by 'appropriation of name or

likeness.'" Lewis, 527 F.Supp.2d at 429 (quoting Vogel v. W.T. Grant Co., 327 A.2d 133 (1974));[6] see also Marks v. Bell Tel. Co. of Pa., 331 A.2d 424, 430 (Pa. 1975). In an appropriation claim, the "use or benefit" at issue is typically a commercial use of one's name or likeness. Fanelle v. LoJack Corp., 79 F.Supp.2d 558, 563-564 (E.D. Pa. 2000)

As federal district courts have noted, the law concerning the tort of appropriation in Pennsylvania is somewhat unsettled. Fanelle, 79 F.Supp.2d at 563; Worthy v. Carroll, 2003 WL 25706359, at *4 (E.D. Pa. 2003). In 1996, Judge Broderick predicted that the Pennsylvania Supreme Court would clarify the law of appropriation by adopting the Restatement (Third) of Unfair Competition. Seale v. Gramercy Pictures, 949 F.Supp. 331 (E.D. Pa. 1996). However, the Pennsylvania Supreme Court has not done so; therefore the Second Restatement appropriation analysis applies. Carroll, 2003 WL 25706359, at *4; Fanelle, 79 F.Supp.2d at 564.

To be liable for appropriation under the Restatement (Second) of Torts, "defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness. . . . Until the value of the name has in some way been appropriated, there is no tort." § 652C cmt. c. In the instant case, Defendant has pled that the Philadelphia Soul falsely designated the email as originating from

_____

[6]Judge Robreno in Lewis considered whether the enactment of 42 Pa. Cons. Stat. § 8316, creating a cause of action for unauthorized use of name or likeness, subsumed the misappropriation of identity tort. He concluded that without further guidance from the legislature or Pennsylvania Supreme Court, the plaintiff had a valid invasion of privacy claim. Lewis, 527 F.Supp.2d at 429. This Court has found no caselaw to suggest the misappropriation of name tort has been subsumed in Pennsylvania, and the parties do not argue this point. See Rossi v. Schlarbaum, 600 F.Supp.2d 650, 662 (E.D. Pa. 2009) (stating that Pennsylvania utilizes the Restatement (Second) of Torts to define invasion of privacy, which includes the distinct tort of appropriation of name or likeness); Burger v. Blair Medical Assoc., Inc., 928 A.2d 246, 250 (Pa. Super. 2007) (same).

himself "as a way to trade upon his good name and reputation." (Countercl. ¶ 20.) In addition, Defendant pled that the Philadelphia Soul used his name "for the express purpose of appropriating the commercial benefit that is particularly associated with Krause's name; specifically the good will and reputation Krause developed with the Philadelphia Soul fan base." (Countercl. ¶ 30). Therefore, Defendant has adequately pled that Plaintiffs sought to appropriate the value of Defendant's name by benefitting from Defendant's reputation and prestige.

Plaintiffs argue that Defendant has not alleged that his name was appropriated for a commercial purpose, and therefore Defendant has not alleged a proper appropriation claim. Despite the fact that Defendant did plead appropriation for "commercial benefit," Plaintiffs legal argument is mistaken. Plaintiffs cite to several cases that discuss the relationship between the misappropriation of name tort based in the right to privacy and the right to publicity: World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc., 280 F.Supp.2d 413, 443-444 (W.D. Pa. 2003); Fanelle, 79 F.Supp.2d 558; and Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc., 627 F.Supp. 856, 862 (E.D. Pa. 1985). Using these cases, they argue that because the tort of misappropriation of the right of publicity is derived from the appropriation branch of the right to privacy, see Eagle's Eye, 627 F.Supp. at 862, or alternatively that because appropriation is grounded in the right of publicity, see Fanelle, 79 F.Supp.2d at 564, and because the right of publicity protects the exclusive right to control the commercial value of one's name or likeness and prevent exploitation of that value, Eagle's Eye, 627 F.Supp. at 862, the tort of misappropriation of name requires a showing that the name was appropriated for commercial advantage. (Pls.' Memo 8-9.)

However, Plaintiffs are conflating two different, though similar, torts. See Rose v. Triple

Crown Nutrition, Inc., 2007 WL 707348, at *3 (M.D. Pa. 2007) ("[T]he right of publicity is not identical to invasion of privacy by appropriation of name or likeness.  Invasion of privacy by appropriation of name or likeness does not require the appropriation to be done commercially." (citing Restatement (Second) of Torts § 652C cmt. b. (1977))); Eagle's Eye, 627 F.Supp. at 862 (quoting Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) for the proposition that the Supreme Court has recognized the right of publicity as an entirely different tort than the traditional invasion of privacy); Lewis, 527 F.Supp.2d at 428-29 (analyzing the torts of misappropriation of publicity and invasion of privacy by misappropriation of identity as two separate and distinct torts).  Comment (b) to the Restatement on the misappropriation of name tort clarifies that there is no "commercial benefit" requirement:

> The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose. . . . however, the rule stated is not limited to commercial appropriation.  It applies also when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one.

Restatement (Second) of Torts § 652C cmt. b.  Comment (d) goes on to clarify that "incidental use," for example mere mention of the plaintiff's name or publication of the plaintiff's likeness without the purpose of taking advantage of its value, is not misappropriation.  Id. at cmt. d.  However, "when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness [ ] the right of privacy is invaded."  Id.

Based on this Restatement commentary, Defendant has pled value in his name, specifically its reputation, prestige, and commercial standing in the sports and entertainment

industry, as described in the secondary meaning analysis above.  In addition, Defendant

specifically pled that Plaintiffs falsely designated the origin of the contested email "to trade upon

his good name and reputation" (Countercl. ¶ 20) and "for the express purpose of appropriating

[its] commercial benefit" (Countercl. ¶ 30).  Therefore, Defendant has alleged a valid claim for

misappropriation of name.  Compare Lewis, 527 F.Supp.2d at 429 n.9 (finding that an esteemed

former executive chef whose name continued to be advertised by his former employer in

connection with its catering packages had adequately pled commercial value in his name to state

a misappropriation of name claim) and Fanelle, 79 F.Supp.2d at 564 (finding that plaintiff's

allegations that defendant used a newspaper article with his name and likeness in a promotional

brochure were sufficient to state an misappropriation of name claim) with Worthy, 2003 WL

25706359, at *4 (dismissing a misappropriation of name claim by the plaintiff, who was

mentioned in a chapter of defendant's book, because plaintiff had failed to allege that his name

had any special reputation, prestige or commercial value or that defendants used it for

commercial purposes).

Plaintiffs further argue that Eastern District decisions require that for a valid

misappropriation claim, the name or likeness must have secondary meaning.  However the case

that Plaintiffs cite for this proposition, Philadelphia Orchestra Ass'n v. Walt Disney Co., 821

F.Supp. 341, 349-350 (E.D. Pa. 1993), analyzes a right to publicity claim, not a misappropriation

of name claim.  Since these claims are distinct, this Court finds that no pleading of secondary

meaning is required to  sustain Defendant's misappropriation of name claim.  See Lewis, 527

F.Supp.2d at 429 (not performing a secondary meaning analysis to a misappropriation of name

claim); Fanelle, 79 F.Supp.2d at 564 (same).

Based on the above discussion, Defendant's misappropriation of name claim has been adequately pled, and this Court will deny Plaintiffs' Motion to Dismiss this counterclaim.

## VI.   <u>Conclusion</u>

Although continuing to pursue his counterclaims will be no "Bed of Roses," Defendant has adequately pled both Lanham Act and misappropriation of name claims such that this Court will deny Plaintiffs' Motion to Dismiss Defendant's Counterclaims.

An appropriate Order follows.

O:\CIVIL 09-10\09-614 AFL v. Krause\Memo MTD.wpd

-29-